IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SCOTT SHEEKS, | |
| Plaintiff, | **8:21-CV-28** |
| vs. | |
| CNH INDUSTRIAL LLC, | **MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

## I.      INTRODUCTION

Scott Sheeks has sued CNH Industrial LLC (CNH) for interfering with his ability to take Family and Medical Leave Act (FMLA) leave and retaliating against him when he took FMLA leave. Filing 1-1 at 5. Before the Court is CNH's Motion for Summary Judgment. Filing 42. For the reasons stated herein, the Court grants in part and denies in part CNH's Motion.

## II.      BACKGROUND

Sheeks began working as a welder for CNH on January 2, 2007. Filing 43-1 at 120. Sometime in 2013, CNH promoted Sheeks to robotic programmer, a position he held for about seven years. Filing 43-1 at 10. CNH required Sheeks to wear welding gear equipment while working, including steel-toed boots. Filing 43-1 at 10.

On July 14, 2020, Sheeks fractured his big toe on his left foot outside of work. Filing 43-1 at 12, 23. Not realizing that he had fractured his toe, Sheeks went to work the following day. Filing

43-1 at 12. While at work, Sheeks experienced pain and discomfort but was otherwise able to perform his job. Filing 43-1 at 12. At around 1:00 p.m. that day, Sheeks removed his work boots and discovered that the area around his left big toe was purple with bruising. Filing 43-1 at 13. Sheeks informed Julie Mayer-Walford, an occupational health manager and a nurse at CNH, and Joey Burnham, his supervisor, about his toe, and they told him to see a doctor. Filing 43-1 at 12–14, 78; Filing 50-1 at 2.

At around 3:30 p.m. that day, Sheeks went to Employer's Healthcare Center (EHC) for an appointment with Bryan Myers, a physician assistant. Filing 43-1 at 14, 133–24. EHC is a clinic that is commonly utilized by CNH's employees. Filing 43-1 at 15, 81. While in the waiting room at EHC, Sheeks saw one of his coworkers, Dean Rhoads, who was also suffering from a foot injury and wearing a medical walking boot on his foot. Filing 43-1 at 15. Rhoads showed Sheeks a steel insert that could be worn with the walking boot instead of the steel-toed boot required by CNH. Filing 43-1 at 15–16. Rhoads told Sheeks that the steel insert went inside the walking boot and rested on top of his sock to provide the same protection as a steel-toed boot. Filing 43-1 at 16. Sheeks pushed the insert into the sandal he was wearing and discovered that the insert would be too painful to wear at work. Filing 43-1 at 15. However, unbeknownst to Rhoads and Sheeks, CNH also had steel toe covers, not steel inserts, that could be attached to medical walking boots. Filing 43-1 at 99. Unlike the steel inserts Rhoads showed to Sheeks, these steel toe covers would not rest directly on the employee's foot. Filing 43-1 at 99.

At his appointment, Sheeks underwent x-rays that showed that he had fractured his big toe in two spots. Filing 43-1 at 15. Myers provided Sheeks with a doctor's note stating that Sheeks could return to work on July 20, 2020, and instructing Sheeks to wear a walking boot at all times. Filing 43-1 at 15–16; Filing 43-3 at 17. The note also requested that CNH accommodate Sheeks

because he could not tolerate the "steel toe insert" and scheduled a follow-up in four weeks. Filing 43-1 at 15–16; Filing 43-3 at 17. Sheeks sent the note to Burnham, who told him that he "probably better file for FMLA." Filing 43-2 at 9–10.

Burnham, Sheeks's supervisor, spoke to Mayer-Walford and Human Resources Manager Lisa Wilson, informing them that CNH would not be able to accommodate Sheeks if the restriction in the doctor's note regarding the steel toe cover remained in place. Filing 43-2 at 17. He then reached back out to Sheeks, telling him that CNH could not accommodate him if he could not wear a steel toe and that Sheeks would need a new note from his medical provider if he was to return to work on July 20, 2020. Filing 43-2 at 3–4, 11. Sheeks claims that, after he received this message, he was under the impression that he did not need to return to work on July 20, 2020, because CNH could not accommodate him. Filing 43-1 at 19. Instead, Sheeks claims that he believed that he was excused from work until his follow-up appointment four weeks later. Filing 43-1 at 17, 21.

On July 20, 2020, Sheeks did not report to work and called Sun Life, a third-party company that processes FMLA claims for CNH, to apply for FMLA leave from July 15, 2020, through August 12, 2020. Filing 43-1 at 20–22, 121. Sheeks requested leave through August 12, 2020, because he believed he was excused from work until his follow-up appointment. Filing 43-1 at 22. Burnham claims that the next day, July 21, 2020, he called Sheeks to tell Sheeks to check in with him while Sheeks was out on leave. Filing 43-2 at 4.

On July 22, 2020, Barb Linnemeyer, a radiology technologist with EHC, emailed Mayer-Walford, the nurse at CNH, asking if there was light duty work available for Sheeks and told Mayer-Walford that Myers, the physician assistant who had provided treatment to Sheeks, would not authorize FMLA leave for four weeks because his doctor's note stated Sheeks could return to work on July 20. Filing 43-1 at 83; Filing 43-3 at 25–27.  Mayer-Walford replied that she gasped

when she saw that Sheeks had applied for four weeks of FMLA leave and stated that Sheeks could weld while wearing a medical boot because three other welders were working while wearing a medical boot. Filing 43-3 at 25. Linnemeyer replied that she talked to Myers who said that he would grant Sheeks time off until July 22, 2020, via a new note and that they would fill out an FMLA and short-term disability form. Filing 43-3 at 25. The new note provided a new return-to-work date of July 23 and stated that Sheeks could work while wearing a medical boot with a steel toe cover. Filing 43-3 at 19, 25. Linnemeyer asked Mayer-Walford to tell Sheeks's supervisor to call Sheeks and have him return to work on July 23.[1] Filing 43-3 at 25. Myers then completed a Fitness for Duty Certification form that authorized Sheeks's FMLA leave from July 16, 2020, to July 22, 2020. Filing 43-4 at 2, 11–13. Ultimately, on July 27, 2020, Sun Life approved Sheeks's FMLA leave from July 16 to July 22 but denied leave from July 23 to August 12. Filing 43-4 at 15–16.

Meanwhile, on July 23, 2020, Sheeks learned from Burnham, his supervisor, that Mayer-Walford had received a doctor's note stating that Sheeks was to return to work that day. Filing 43-2 at 12. When Sheeks messaged Mayer-Walford about the second note, Mayer-Walford sent the note to Sheeks and explained that Linnemeyer called to tell her that Sheeks needed to return to work. Filing 43-3 at 7. Sheeks responded that he did not know anything about the second note, to which Mayer-Walford elaborated that she received the note at 4:00 p.m. on July 22, and that she had wondered if a second doctor's appointment or Sheeks filing for FMLA leave prompted the new note. Filing 43-3 at 7–8. Mayer-Walford told Sheeks he needed another note granting him time off for July 23 so that Sheeks would not be disciplined. Filing 43-3 at 8. When Sheeks replied that Myers, the physician assistant, was not available—and offered to come in to show Mayer-

---

[1] Nothing in the record shows whether Burnham called Sheeks to tell him to return to work.

Walford that the steel insert hurt too much—Mayer-Walford contacted EHC and procured a note excusing Sheeks from work for July 23, 2020. Filing 43-3 at 8.

On July 24, 2020, Mayer-Walford messaged Sheeks to ask him if he wanted to return to work on July 27. Filing 43-3 at 10. She explained that she asked Linnemeyer, the radiology technologist at EHC, for another note. Filing 43-3 at 10. Mayer-Walford also stated that if Sheeks returned to work she could figure out what he could wear to protect his foot. Filing 43-3 at 10. Sheeks told Mayer-Walford that he would rather wait until he no longer needed a medical boot before he returned to work. Filing 43-3 at 10. Mayer-Walford replied that Sheeks needed to try on a "steel toe or something" because Sheeks had been off of work for a while. Filing 43-3 at 10. Sheeks responded that they could "try" the cap, that a pay cut was worth not working with his broken toe, and that he wanted his toe to heal properly. Filing 43-3 at 10. Mayer-Walford replied that she would call Linnemeyer, joked that Sheeks was making too much work for her,[2] and warned Sheeks that Sun Life probably would not approve four weeks leave for a toe fracture. Filing 43-3 at 10.

Later that day, Sheeks had a second appointment with Myers, the physician assistant at EHC. Filing 43-1 at 23, 25, 27. After the appointment, Myers issued another doctor's note that excused Sheeks from work until July 27, 2020, and stated that Sheeks needed to wear a medical boot with a steel toe cover or the regular work boot. Filing 43-3 at 21. Sheeks sent the note to Mayer-Walford and Burnham. Filing 43-1 at 27. However, Sheeks did not return to work on July 27. Filing 43-1 at 28.

---

[2] Mayer-Walford included a "laughing emoji" after making this remark. Filing 43-3 at 10.

On July 25, 2020, a Saturday, Sheeks travelled to Calamus Lake. Filing 43-1 at 19–20. While at Calamus Lake, Sheeks stood in the water without his boot on and walked on the sand along the shoreline. Filing 43-1 at 20.

On July 29, 2020, Mayer-Walford sent a message to Sheeks stating that she was going to be looking for work for Sheeks that did not require wearing a steel toe. Filing 43-3 at 13. Sheeks asked if he should come in to work to see her, and Mayer-Walford told him no. Filing 50-1 at 11–12. That day, Sheeks had another appointment with Myers. Filing 43-1 at 29. After the appointment, Myers sent a medical note to Mayer-Walford releasing Sheeks to work with lifting and standing restrictions and requiring Sheeks to wear a medical boot at all times. Filing 43-3 at 23. Sheeks also sent a message to Burnham, stating that he was returning to work on July 30, 2020, with restrictions. Filing 43-2 at 5. CNH then received a fax from EHC stating that Sheeks was unable to work in his current capacity and that Sheeks had tried a steel toe covering but it caused increased pain.[3] Filing 43-1 at 159. The fax asked that Sheeks be excused from work from July 27, 2020, to July 29, 2020. Filing 43-1 at 159.

On July 31, 2020, Mayer-Walford, Paul Soto, one the managers at CNH, and Lisa Wilson, CNH's Human Resources Manager, had a conversation about Sheeks's leave, the medical certification CNH had received, and why Sheeks had not returned to work. Filing 43-1 at 124; Filing 50-3 at 3. According to Wilson, Mayer-Walford claimed that she had asked Sheeks to return to work, but Sheeks had failed to do so. Filing 43-1 at 124. CNH's attendance policy provides that an unexcused absence from work counts as an "occurrence" and that failing to inform CNH ahead of time of an absence counts as one-half of an occurrence. Filing 43-1 at 136; Filing 43-4 at 6–7. After seven occurrences, CNH may discharge the offending employee. Filing 43-1 at 136; Filing

---

[3] Sheeks did not try on the toe covering at the appointment. Filing 43-1 at 30–31

43-4 at 6–7. Wilson determined that Sheeks had failed to return to work to try on a steel toe cover from July 23 to July 31 despite several doctor's notes stating that Sheeks was to return to work with an accommodation. Filing 43-1 at 136–37. Wilson also took issue with Sheeks not returning to work when he was able to go to Calamus Lake on July 25. Filing 43-4 at 19. Therefore, pursuant to CNH's attendance policy, Wilson and CNH's legal department determined that Sheeks should be fired for failing to return to work. Filing 43-1 at 124. Wilson then called Sheeks informing him that he had been fired. Filing 43-1 at 124. After being terminated, Sheeks received a letter from Sun Life informing him that he was approved for short-term disability benefits from July 16 to July 28. Filing 43-1 at 157. Sun Life approved Sheeks for short-term disability benefits after determining that he could not work from July 16 to July 28 with his current restrictions. Filing 43-1 at 123, 129, 157. However, because Sheeks no longer worked for CNH, he did not receive disability benefits. Filing 43-1 at 126.

Sheeks filed suit against CNH in Nebraska state Court. Filing 1 at 1–2. On January 22, 2021, CNH removed Sheeks's suit to this Court. Filing 1. In his Complaint, Sheeks claims that CNH unlawfully interfered with his ability to take FMLA leave and retaliated against him for taking FMLA leave by firing him. Filing 1-1 at 5. CNH filed its motion for Summary Judgment on February 10, 2022. Filing 42.

### III.   ANALYSIS

### A.  Standard of Review

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is

designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (citing *Celotex*, 477 U.S. at 323). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v.*

8

*Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

### B. FMLA Claims

The FMLA provides employees with a total of twelve workweeks of unpaid leave during any 12-month period for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Pursuant to § 2615 of the FMLA, an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the FMLA or "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(1)–(2). Sheeks brings two claims under the FMLA: an interference claim, "in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA," and a retaliation claim, "in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)-(2)). Sheeks accuses CNH of interfering with his right to take FMLA leave and retaliating against him for taking FMLA leave by wrongfully terminating him. Filing 49 at 2. CNH makes several arguments in response, the main one being that CNH terminated Sheeks for violating its attendance policy, not for taking FMLA leave. Filing 44 at 14–23. The Court addresses each of Sheeks's claims in turn and concludes that CNH is entitled to summary judgment on Sheeks's retaliation claim but not on his interference claim.

#### 1. *Interference Claim*

"To prevail on an interference claim, an employee has the burden of proving [1] that she was entitled to a benefit under the FMLA, [2] that the employer 'interfered with,' *i.e.*, denied the

employee, that entitlement, and [3] that the reason for denial was connected to the employee's FMLA leave." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1158 (8th Cir. 2016) (bracketed numbers inserted). "An employer 'cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.'" *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) (quoting 29 C.F.R. § 825.220(c)). "For an interference claim, the employer's intent is immaterial." *Id.*

Sheeks contends that CNH interfered with his right to take FMLA leave by terminating his employment during a time in which he was entitled to FMLA leave. Filing 49 at 2, 19. If Sheeks was entitled to FMLA leave on the day CNH terminated his employment, then CNH interfered with Sheeks's FMLA rights. *See Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) ("[E]very discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights."); *see also Phillips v. Mathews*, 547 F.3d 905, 909, 911 (8th Cir. 2008) (considering an employee who was entitled to FMLA leave to be on FMLA leave for the purposes of analyzing an FMLA interference claim). Sun Life, the third-party processer of FMLA claims for CNH, approved Sheeks for FMLA leave from July 16, 2020, to July 22, 2020. Filing 43-4 at 15–16. However, because Myers, the physician assistant treating Sheeks, did not fill out paperwork authorizing FMLA leave after July 22, Sun Life denied Sheeks's request for FMLA leave from July 23 to August 12. Filing 43-4 at 12–13, 15–16. CNH terminated Sheeks's employment for failing to call in or show up for work from July 23 to July 31. Filing 43-1 at 124, 136–37. The issue, therefore, is whether Sheeks has provided evidence from which a reasonable jury could conclude that he was entitled to FMLA leave after July 22, 2020. *See Ballato*, 676 F.3d

10

at 772 ("The initial burden of proof in an FMLA interference case is on the employee to 'show only that he or she was entitled to the benefit denied.'" (quoting *Stallings*, 447 F.3d at 1050)).

An employee may show an entitlement to FMLA leave by providing evidence that the employee suffered from a serious health condition that prevented the employee from performing his or her job.[4] *See Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 472 (8th Cir. 2007) (noting that "a serious health condition is a prerequisite for FMLA leave"); 29 U.S.C. § 2612(a)(1)(D) (providing that an employee is entitled to FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee"). The record shows that Myers provided treatment to Sheeks for his fractured toe during three doctor's appointments. Myers also sent several doctor's notes to CNH excusing Sheeks from work from July 23 through July 29. Filing 43-1 at 159; Filing 43-3 at 19, 21, 24; Filing 43-4 at 8. In his July 29 doctor's note, Myers released Sheeks to return to work with several restrictions, including a requirement that Sheeks needed to wear a medical boot at all times. Filing 43-4 at 23. Furthermore, Mayer-Walford, CNH's nurse, knew that CNH needed to accommodate Sheeks's medical boot if Sheeks was to perform his job. Filing 43-4 at 10, 13. However, whether CNH could accommodate Sheeks was not resolved by the time CNH fired Sheeks on July 31. Indeed, Mayer-Walford indicated that she was still looking for ways to accommodate Sheeks on July 29 and July 30. Filing 43-3 at 14–15. Finally, Sun Life approved Sheeks for short-term disability benefits through July 28, 2020, after determining that he was unable to work because of his work restrictions. Filing 43-1 at 123, 129, 157.

The Court concludes that Sheeks has provided sufficient evidence from which a reasonable jury could find that he was entitled to FMLA leave on the day CNH terminated his employment.

---

[4] Sun Life's approval of FMLA leave from July 16 to July 22 is evidence that Sheeks suffered from a serious health condition during that period.

A reasonable jury could infer that Myers excused Sheeks from work from July 23 through July 29 because he determined that Sheeks was unable to work due to his broken toe. *See Joslin v. Rockwell Int'l Corp.*, 8 F. Supp. 2d 1158, 1161 (N.D. Iowa 1998) (stating that showing that a "health provider" determining that "an extended absence from work is necessary" can show an entitlement to FMLA leave); *cf. Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1195 (8th Cir. 2000) (holding that the plaintiff did not have an entitlement to FMLA leave because neither of his doctors determined that the plaintiff's injury "was of such severity as to make him unable to perform his job"). The fact that Sun Life approved Sheeks for short-term disability benefits provides further evidence that Sheeks was unable to work for this period.

Furthermore, CNH terminated Sheeks's employment on July 31, a mere two days from the last day on which Myers excused Sheeks from work. During those two days, the record indicates that Mayer-Walford was searching for a way to accommodate Sheeks's work restrictions, but the issue of whether Sheeks could be accommodated and return to work was never resolved. Indeed, Myers's July 29 note included working restrictions beyond Sheeks having to wear a medical boot. Nothing in the record shows that Sheeks was able to perform his job with the additional restrictions in Myers's July 29 note. Accordingly, a genuine dispute exists over whether Sheeks was still unable to work on July 31 when CNH terminated his employment.

But even assuming that Sheeks was not entitled to FMLA leave on July 31 does not mean that summary judgment in CNH's favor is warranted. The FMLA prohibits employer's from "attach[ing] negative consequences to the exercise of protected rights . . . ." *Stallings*, 447 F.3d at 1050. Nor can an employer "use the taking of FMLA leave as a negative factor in employment actions . . . ." *Ballato*, 676 F.3d at 772 (quoting 29 C.F.R. § 825.220(c)). Once an employer is on notice that an employee is suffering from a serious health condition, the employer has a duty "to

count the employee's absence as FMLA leave or inquire further into the matter by requesting a medical certification form." *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 787 (8th Cir. 2009). Therefore, if CNH counted a day on which Sheeks was entitled to FMLA leave as an unexcused absence, it has interfered with his rights under the FMLA.

CNH terminated Sheeks's employment for violating its attendance policy. According to that attendance policy, after Sheeks failed to show up for work or call in his absences for three days he could be fired. Filing 43-1 at 136. As this Court has already concluded, there is sufficient evidence from which a reasonable jury could find that Sheeks was entitled to FMLA leave on the days Myers excused him from work from July 23 through July 29. Assuming for the sake of argument that Sheeks was not entitled to FMLA leave on July 30 and July 31, CNH still had to count one of the days between July 23 and July 29 as an unexcused absence to terminate Sheeks's employment under its attendance policy. Because CNH necessarily had to consider one of the days between July 23 and July 29 as an unexcused absence, a reasonable jury could find that CNH interfered with Sheeks's right to FMLA leave by concluding that Sheeks was entitled to FMLA leave between July 23 and July 29 and CNH counted one of those days as an unexcused absence under its attendance policy. *See Archey v. AT&T Mobility Servs. LLC*, No. CV 17-91-DLB-CJS, 2019 WL 1434654, at *2, *7–*9 (E.D. Ky. Mar. 29, 2019) (denying summary judgment for employer on an FMLA interference claim when the employer counted a day on which the employee was entitled to FMLA leave as an unexcused absence supporting termination); *see also Culpepper v. BlueCross BlueShield of Tennessee, Inc.*, 321 F. App'x 491, 496 (6th Cir. 2009) ("An employee . . . who believes that she was entitled to FMLA leave with respect to her unexcused absences, may assert a cause of action for FMLA interference." (citing *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007))).

Having concluded that Sheeks has provided sufficient evidence to show that CNH interfered with his rights under the FMLA, the Court turns to whether the reason for terminating Sheeks's employment was connected to Sheeks's entitlement to FMLA leave. An employer's intent is immaterial in an interference claim. *Ballato*, 676 F.3d at 772). Nevertheless, "the FMLA is not a strict-liability statute." *Estrada v. Cypress Semiconductor (Minnesota) Inc.*, 616 F.3d 866, 871 (8th Cir. 2010). "An employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA than she did before taking the leave." *Id.* Therefore, the employer will not be liable for FMLA interference if it can "prove it would have made the same decision had the employee not exercised the employee's FMLA rights." *Id.* (quoting *Throneberry*, 403 F.3d at 980).

CNH argues that its decision to terminate Sheeks's employment stemmed from Sheeks violating CNH's attendance policy, which it argues is "entirely unrelated" to Sheeks's rights under the FMLA. Filing 44 at 17. Contrary to that contention, the record shows that Wilson, CNH's human resources manager who determined that Sheeks should be fired, considered Sheeks's absences from work from July 23 to July 31 as violating CNH's attendance policy. As this Court has already concluded, a reasonable jury could find that Sheeks was entitled to FMLA leave during that period. Thus, if a jury concludes that Sheeks was entitled to FMLA leave during this period, Wilson's decision to terminate Sheeks's employment directly involved his entitlement to FMLA leave. *See Dickinson v. St. Cloud Hosp.,* No. CIV. 07-3346 ADM/RLE, 2008 WL 4659562, at *4–*5 (D. Minn. Oct. 20, 2008) (concluding that a jury could find that the employer interfered with the plaintiff's rights under the FMLA by not taking FMLA leave into account when determining the plaintiff's absenteeism rate); *Davis v. Boise Cascade Corp.*, No. CIV. 03-06081MJDRLE, 2005 WL 1324017, at *2–*5, *11 (D. Minn. June 3, 2005) (finding that the employer had interfered

with the plaintiff's rights under the FMLA by using his absence form work caused by a serious medical condition as a "negative factor" against him); *see also Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014) ("[W]hen the absences and cause for discharge relate directly to the FMLA leave . . . there is no legitimate and independent reason for dismissal.").

The Court concludes that Sheeks has presented sufficient evidence from which a reasonable jury could determine that CNH interfered with his right to FMLA leave. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 911 (8th Cir. 2011) ("The court should deny summary judgment if there is sufficient evidence for a jury to return a verdict for the non-moving party.").

### 2. Retaliation Claim

Sheeks has also brought an FMLA retaliation claim against CNH. "In a retaliation claim, "the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012) (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)). "Plaintiffs may demonstrate discrimination by introducing direct or indirect evidence." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 924 (8th Cir. 2014). "Direct evidence reveals a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* "Absent direct evidence, an FMLA discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework." *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013). Under this framework, Sheeks must show that (1): he "engaged in protected conduct;" (2) he "suffered a materially adverse employment action;" and (3) "the materially adverse action was

15

causally linked to the protected conduct." *Sisk*, 669 F.3d at 900 (quoting *Wierman*, 638 F.3d at 999).

Sheeks first asserts that he has direct evidence of FMLA discrimination and, therefore, need not show a prima facie case under the *McDonnel Douglas* burden-shifting framework. Filing 49 at 12–13. According to Sheeks, Mayer-Walford stated on July 22 that "she didn't like plaintiff taking FMLA leave." Filing 49 at 13. Although Sheeks does not point the Court to the relevant statement, it appears that Sheeks is referring to when Mayer-Walford wrote in a July 22 email that she "gasped" when she saw that Sheeks had applied for four weeks of FMLA leave and that Sheeks could weld with a medical boot because three other welders at CNH were working with a medical boot. Filing 50-6 at 2. At her deposition, Mayer-Walford explained that she gasped because she knew that Sheeks had confused the amount of leave he should request with his follow-up appointment date. Filing 43-1 at 95. According to Mayer-Walford, she had seen many doctor's notes from EHC, the health clinic with which Sheeks had an appointment, that had confused CNH's employees, and she was upset that she was going to have to explain to Sheeks the difference between a follow-up appointment and when he needed to return to work. Filing 43-1 at 95.

Mayer-Walford saying that she "gasped" when she saw that Sheeks had applied for four weeks of FMLA leave does not provide "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Ebersole*, 758 F.3d at 924 (citing *Torgerson*, 643 F.3d at 1044). Nothing in the record supports the notion that Mayer-Walford had any ill will toward Sheeks or provides any reason why Mayer-Walford would want

16

him fired. The fact that she "gasped" is not the type of "strong" evidence that "clearly point[s]" to an illegal motive.[5] *Id.*

Because Sheeks lacks direct evidence of discrimination, he must proceed under the *McDonnel Douglas* burden-shifting framework. To establish a prima facie case of FMLA retaliation, Sheeks must show that (1) he engaged in protected conduct; (2) he suffered a materially adverse employment action; and (3) a causal link between the materially adverse action and the protected conduct exists. *Sisk*, 669 F.3d at 900 (quoting *Wierman*, 638 F.3d at 999). CNH concedes that Sheeks has met elements (1) and (2), but it argues that Sheeks cannot show a causal link between CNH terminating Sheeks's employment and Sheeks exercising his rights under the FMLA. Filing 44 at 18.

The Court concludes Sheeks has provided sufficient evidence from which a jury could find a causal link between his termination and his exercise of his rights under the FMLA. *See Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (noting that a "very close" temporal proximity between the protected conduct and the adverse action can "create an inference of the causal link"). "Employees may show the causal link based on the temporal relation of the protected activity and the adverse employment action." *Ebersole*, 758 F.3d at 924. CNH learned that Sheeks applied for FMLA leave on July 20, and CNH terminated his employment eleven days later.[6] *See*

---

[5] Moreover, Mayer-Walford was not the one who made the decision to fire Sheeks. Instead, Wilson upon consultation with CNH's legal department terminated Sheeks's employment. *See Massey-Diez*, 826 F.3d at 1160 (noting that the direct evidence must show bias on the part of the decisionmaker that relates to the decisional process).

[6] The decisionmakers in this case are Wilson with consultation of CNH's legal department. Retaliation usually depends on the knowledge and motivation of the decisionmakers. *See Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009) (holding that there was no causation when the decisionmaker did not know that the plaintiff had complained about discrimination); *Jennings v. Mid-Am. Energy Co.*, 282 F. Supp. 2d 954, 964 (S.D. Iowa 2003) (finding that there was no evidence of pretext when alleged discriminatory comment was not made by a decisionmaker); *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (holding that there is no causal connection when the decisionmaker is unaware of the protected activity); *but see Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (holding that when a decisionmaker serves as a "mere conduit" of another's discriminatory motives, an employer cannot avoid liability). Sheeks applied to Sun Life for FMLA leave on July 20 and, according to Wilson, Sun Life notifies CNH's human resources department when an employee requests leave. Therefore, the Court measures

*Sisk*, 669 F.3d at 900 (holding that courts measure temporal proximity from "the date an employer knew of an employee's use (or planned use) of FMLA leave" to the date of the adverse action). This time frame is "extremely close," and thus sufficient for a jury to find a causal link. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (holding that thirteen days between exercising rights and the adverse employment action was "sufficient, but barely so, to establish causation").

Establishment of a prima facie case does not end the matter, however. After an employee establishes a prima facie case, "The burden then shifts to the employer to 'articulate a legitimate, non-retaliatory reason for its action.'" *Sisk*, 669 F.3d at 899 (quoting *Wierman*, 638 F.3d at 999). "If the employer meets this burden of production, the employee 'must then identify evidence sufficient to create a genuine issue of material fact whether [the employer's] proffered explanation is merely a pretext for unlawful retaliation.'" *Id.* (quoting *Wierman*, 638 F.3d at 999) (alteration in original). "The employer's responsibility to present proof of a non-discriminatory, legitimate justification for its action is not an onerous task." *Ebersole*, 758 F.3d at 925. An employee violating a company policy is a legitimate reason to terminate that employee. *Id.*

Here, CNH argues that Sheeks violated its attendance policy, which justifies its decision to terminate his employment. Filing 44 at 19–21. Violating an attendance policy is a legitimate, non-retaliatory reason for discharging an employee. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 551 (8th Cir. 2021) (holding that "excessive unexcused absences" is a legitimate reason to fire an employee and turning to whether the plaintiff showed that the employer's explanation was pretextual); *Chappell v. Bilco Co.*, 675 F.3d 1110, 1117 (8th Cir. 2012) (holding that the plaintiff failed to show that being fired for violating the defendant's attendance policy was a pretext for

---

temporal proximity by starting with the date that Wilson and CNH's legal team learned that Sheeks applied for FMLA leave, which is July 20.

discrimination). The Court therefore turns to whether Sheeks demonstrates that CNH's explanation for firing him is "really a pretext for discrimination." *Ebersole*, 758 F.3d at 925. "To demonstrate pretext, the employee must show that the employer's proffered reason is 'unworthy of credence.'" *Id.* (quoting *Hite*, 446 F.3d at 867). "To show pretext, the plaintiff must demonstrate more than at the prima facie stage because, at the pretext stage, the evidence is viewed in light of the employer's justification." *Id.*

CNH claims it fired Sheeks for violating its attendance policy. CNH's attendance policy provides that if an employee receives seven "occurrences," the employee may be discharged. Filing 43-4 at 7. An employee receives one occurrence for any single day of absence during a scheduled workday, and the employee receives one-half of an occurrence if he or she fails to call in an absence at least thirty minutes prior to the start of the shift. Filing 43-4 at 6–7. Therefore, failing to call in and show up for work for three days warrants termination under the attendance policy. Filing 43-1 at 136. To decide if Sheeks should be discharged, Wilson spoke to Mayer-Walford, who told Wilson that she had asked Sheeks to come to work and that Sheeks had not returned to work. Filing 43-1 at 124, 126. Wilson also spoke to Burnham on or about July 22, who said that he had concerns about Sheeks being released to return to work and then not returning. Filing 43-1 at 138. Additionally, Wilson reviewed Sheeks's doctor's notes with Paul Soto, a manager at CNH. Filing 43-1 at 138.

Ultimately, after speaking with Mayer-Walford, Burnham, and Soto, Wilson and CNH's legal department decided to terminate Sheek's employment because he failed to return to work and try on a steel toe cover. Filing 43-1 at 132. Wilson noted that from July 23 to July 31 Sheeks did not show up to work or inform CNH that he was going to be absent despite receiving doctor's notes releasing him to return to work and Mayer-Walford supposedly telling him to come to work

19

to try on a steel toe cover. Filing 43-1 at 136–37. Even though Sheeks was subject to termination after three days of failing to call in or show up to work, Wilson waited seven days to give Sheeks ample opportunity to come to work to try on a steel toe cover. Filing 43-1 at 136.

Sheeks argues that he can show pretext because Mayer-Walford made several misrepresentations to him. Filing 49 at 16. The flaw in Sheeks's argument is that Mayer-Walford was not the person who decided that Sheeks should be fired.[7] See Wierman, 638 F.3d at 996 (noting that the plaintiff did not show that any comparable employee was treated more favorably than herself by the decisionmaker); Robinson v. Potter, 453 F.3d 990, 994 (8th Cir. 2006) (holding that the plaintiff could not show causation because the decisionmakers were unaware of the plaintiff engaging in protected activity); Jennings, 282 F.Supp.2d at 964 (finding that a statement by non-decisionmaker was not relevant to the pretext analysis). Instead, Wilson—with consultation from CNH's legal department—decided to terminate Sheeks's employment after conducting an investigation. Unlike an interference claim, in which an employer's intent is immaterial, Ballato, 676 F.3d at 772, the critical inquiry in Sheeks's retaliation claim is whether Wilson and CNH "in good faith" believed that Sheeks was guilty of violating CNH's attendance policy.[8] See Pulczinski

---

[7] Nor is there evidence that the decisionmakers in this case were a "mere conduit" for Mayer-Walford's alleged discriminatory motive. See Richardson, 448 F.3d at 1060 (holding that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." (quoting Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003)). The record shows that Wilson conducted an independent investigation, spoke to multiple individuals, and reviewed Sheeks's doctor's notes to determine that Sheeks should be fired. See Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 725 (8th Cir. 1998) (holding that there was no evidence that the individuals with an unlawful motive influenced the defendant's decision to terminate the plaintiff's employment and that the defendant's board "made an independent determination as to whether [the plaintiff] should be terminated").

[8] This distinction is important, because it explains why Sheeks's interference claim survives and why Sheeks's retaliation claim fails. When addressing Sheeks's interference claim, the Court concluded that, irrespective of Wilson's intent, the fact that she counted as unexcused absences days on which Sheeks may have been entitled to FMLA leave constitutes interference with Sheeks's rights under the FMLA. However, retaliation requires Sheeks to provide sufficient evidence to infer that Wilson acted with a retaliatory motive. Because Sheeks has not provided evidence casting doubt on whether Wilson, in good faith, believed that Sheeks violated the attendance policy, no reasonable jury could find for Sheeks on his FMLA retaliation claim.

*v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) ("Our precedent establishes that the 'critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" (quoting *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009))). Sheeks must show "a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination." *McCullough*, 559 F.3d at 862.

Wilson testified that, under CNH's attendance policy, if an employee misses a day of work that is not preapproved or certified by Sun Life the employee receives a one-point occurrence, and if the employee fails to call in ahead of time that he or she will be absent from work the employee is assessed one-half of an occurrence. Filing 43-1 at 134. Once an employee receives seven occurrence points, the employee is subject to discharge. Filing 43-4 at 8. Thus, failing to call in or show up for work for three days warrants termination under CNH's attendance policy. Filing 43-1 at 136. Wilson further asserted that Sheeks's doctor's notes did not excuse him from work from July 23 to July 29 because all the notes released Sheeks to return to work and Sheeks failed to come to work. Filing 43-1 at 135. Before making her decision, Wilson also spoke to Burnham on or about July 22, who stated he had concerns about Sheeks being released to return to work and not returning, and Mayer-Walford, who stated that she had asked Sheeks to return to work. It is undisputed that Sheeks failed to call in to report his absences as required by CNH's attendance policy, which states that employees must call in 30 minutes before the start of their shift. Filing 43-4 at 7. Moreover, nothing in CNH's attendance policy states that a doctor's note retroactively excusing a person from work—as Myers's doctor's notes attempted to do—is sufficient to prevent

an employee from receiving an occurrence. Filing 43-4 at 8–9. Relying on this information, Wilson concluded that Sheeks's failure to return to work from July 23 to July 31 to try on a steel toe cover violated CNH's attendance policy. Filing 43-1 at 136.

The Court concludes that Sheeks has not provided sufficient evidence from which a reasonable jury could find that Wilson acted with a discriminatory motive rather than a good-faith belief that Sheeks violated CNH's attendance policy. The undisputed facts show that Wilson made her decision by relying on Burnham saying he had concerns about Sheeks not returning to work; Mayer-Walford's statement that she asked Sheeks to return to work; the doctor's notes releasing Sheeks to return to work; and the fact that Sheeks did not return to work between July 23 and July 31. Nothing in the record shows that Wilson misapplied the attendance policy. *See Phillips*, 547 F.3d at 913 (noting that a plaintiff may show pretext by demonstrating that "the employer deviated from its policies"). As CNH's attendance policy shows, CNH could have terminated Sheeks after he neglected to return to work while not calling in to report his absence for three days. Filing 43-4 at 6–9. And although it may be disputed whether Mayer-Walford told Sheeks to return to work, there is no dispute that Wilson believed that Mayer-Walford told Sheeks to come to work to try a steel toe cover.[9] *See Pulczinksi*, 691 F.3d at 1004 ("It is not our province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination."). Sheeks has not provided evidence that Wilson's findings "were motivated by unlawful discrimination, rather than a good-faith belief" that Sheeks violated CNH's attendance policy. *Wierman*, 638 F.3d at 997. Accordingly, a reasonable jury could not conclude that Sheeks has shown that Wilson's reason for terminating his

---

[9] Wilson testified that she was not privy to the conversation over Facebook Messenger between Sheeks and Mayer-Walford. Filing 43-1 at 133–35. Sheeks has not presented any evidence to contest that testimony. Thus, what Mayer-Walford told Sheeks cannot be imputed to Wilson.

employment was pretextual. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## IV.   CONCLUSION

CNH is entitled to summary judgment on Sheeks's FMLA retaliation claim but is not entitled to summary judgment on Sheeks's FMLA interference claim.  Accordingly,

IT IS ORDERED:

1.  CNH's Motion for Summary Judgment, Filing 42, is granted in part and denied in part.

Dated this 12th day of May, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge